FILED

2011 DEC -7  PM 4:18

CLERK, U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2011 Grand Jury

UNITED STATES OF AMERICA,  )  NO. CR 11 01165
                           )     CR 11-
            Plaintiff,     )
                           )  I N D I C T M E N T
      v.                   )
                           )  [15 U.S.C. §§ 77e, 77x:
JOHN FARAHI and            )  Unregistered Offer and Sale of
DAVID TAMMAN,              )  Securities; 18 U.S.C. § 1341:
                           )  Mail Fraud; 18 U.S.C. § 1343:
            Defendants.    )  Wire Fraud; 18 U.S.C. § 1014:
                           )  Loan Fraud; 18 U.S.C. §§ 371,
                           )  1512(k): Conspiracy to Obstruct
                           )  Justice; 18 U.S.C.
                           )  § 1512(c)(2): Obstruction of
                           )  Justice; 18 U.S.C. § 1519:
                           )  Destruction, Alteration,
                           )  Falsification of Records; 18
                           )  U.S.C. § 1622: Subordination of
                           )  Perjury; 18 U.S.C.
                           )  § 1512(b)(1): Witness
                           )  Tampering; 18 U.S.C. § 3:
                           )  Accessory After the Fact; 18
                           )  U.S.C. § 1001(a)(1):
                           )  Falsifying, Concealing and
                           )  Covering Up a Material Fact; 18
                           )  U.S.C. § 1028A: Aggravated
                           )  Identity Theft; 18 U.S.C.
                           )  § 2(a): Aiding and Abetting;
                           )  18 U.S.C. § 2(b): Causing an
                              Act to Be Done]

The Grand Jury charges:

COUNTS ONE THROUGH SIXTEEN

[18 U.S.C. § 1341]

I.   **INTRODUCTION**

At all times relevant to this Indictment:

1.   New Point Financial Services, Inc. ("NPFS") was a Nevada corporation and conducted its business from offices located in Beverly Hills, California.  NPFS offered and sold in excess of $20 million worth of investment instruments, known as debentures, to more than one hundred investors.

2.   NPFS operated in conjunction with several related entities that also offered a range of investment opportunities to prospective investors, including: NewPoint Securities, LLC; NewPoint Mortgage Bankers, Inc. ("NPMB"); and Parsi Investments LLC ("Parsi") (collectively, the "NewPoint Entities" or "NewPoint").  The businesses encompassed by the NewPoint Entities operated from the same offices as NPFS in Beverly Hills, California.

3.   Defendant JOHN FARAHI ("FARAHI") was the co-owner, president, and principal manager of NPFS and the NewPoint Entities.  Defendant FARAHI's wife was a co-owner of NPFS and served for some time as its vice-president.  Defendant FARAHI hosted a daily financial program on a Farsi-language radio station.

4.   To attract investors, defendant FARAHI used his daily radio program to tout his and his companies' conservative investment philosophy.  On his radio show, defendant FARAHI

2

1  frequently gave listeners his office phone number and encouraged
2  them to contact him for more information.

3      5.    Elaheh Amouei ("Amouei") served as the bookkeeper and
4  controller for NPFS and the NewPoint Entities, and as the
5  personal bookkeeper for defendant FARAHI and defendant FARAHI's
6  wife.

7  II.  **THE SCHEME TO DEFRAUD**

8      6.    Beginning on a date unknown to the Grand Jury but at
9  least as early as in or about November 2005, and continuing to in
10 or about April 2009, in Los Angeles County, within the Central
11 District of California, and elsewhere, defendant FARAHI, together
12 with and aided and abetted by others known and unknown to the
13 Grand Jury, knowingly and with the intent to defraud, devised,
14 participated in, and executed a scheme to defraud victim
15 investors of NPFS, NPMB, and Parsi as to material matters, by
16 depriving the victim investors of money and property, and by
17 obtaining from the victim investors money and property by means
18 of materially false and fraudulent pretenses, representations,
19 and promises and the concealment of material facts.

20     7.    The scheme to defraud was carried out, in substance, in
21 the following ways, among others:

22     A.    **The NPFS Investment Fraud**

23         a.    Once interested investors contacted FARAHI's
24 offices, defendant FARAHI's employees scheduled meetings with the
25 prospective investors and defendant FARAHI at his Beverly Hills
26 offices.  At these meetings, defendant FARAHI would encourage
27 prospective investors to invest in one or more of the investments
28 NPFS, Parsi, and NPMB were offering, generally telling them that

their money would be invested in safe, low- or no-risk investments.

b.   Defendant FARAHI offered potential investors the opportunity to purchase debentures issued by NPFS, which were purportedly structured as loans to NPFS providing investors with a fixed rate of return and a return of investment principal at the conclusion of a specified term.

c.   When potential investors met with defendant FARAHI, he assured many of them that the purchase of NPFS debentures would afford them a safe and reliable investment instrument, minimizing risks to their investment principal while affording rates of return marginally greater than those available through bank deposit accounts or money market funds. Defendant FARAHI led potential investors to believe that their money would be invested in relatively safe and low- or no-risk investments such as Certificates of Deposits ("CDs") backed by the Federal Deposit Insurance Corporation ("FDIC"), government bonds, or corporate bonds. Defendant FARAHI, in some instances, also assured investors that NPFS had insurance to protect investors' money.

d.   Following the steep decline in the stock market in the fall of 2008, defendant FARAHI also told several investors that NPFS would be investing in the corporate bonds of companies backed by the United States government through various government programs, including the Troubled Asset Relief Program ("TARP"). Defendant FARAHI told several of these investors that the only risk they had of losing their investment was if the United States government failed.

4

e. Contrary to defendant FARAHI's representations, NPFS generally did not place investors' monies in the type of low-risk investments he described. Rather, defendant FARAHI, assisted by others known and unknown to the Grand Jury, used new investor funds for a range of undisclosed purposes, including, among others, the following: (1) to make interest payments and principal repayments to previous investors at NPFS and the NewPoint Entities; (2) to pay defendant FARAHI's substantial personal expenses, including those involving his Beverly Hills home, cars, and yacht; (3) to provide gifts and loans to defendant FARAHI's friends and family; and (4) to finance high-risk and speculative futures options trading that defendant FARAHI engaged in through a brokerage account maintained in the name of his wife. Further, NPFS did not have insurance that would protect investors' funds, as defendant FARAHI represented to investors.

f. Defendant FARAHI failed to disclose to NPFS's investors that he was using their money to pay off prior investors, to support his options trading, or for other personal and discretionary purposes, and not to invest in low-risk corporate or government bonds that he described to investors to induce them to purchase NPFS debentures.

g. In the fall of 2008, defendant FARAHI suffered more than $30 million in losses resulting from his risky options trading in his wife's brokerage account. Defendant FARAHI covered those losses in part with NPFS investor money. As a result of these losses, defendant FARAHI's and NPFS's ability to

repay NPFS investors and other creditors was significantly jeopardized.

h.    In the face of staggering losses in his wife's brokerage account, defendant FARAHI continued to assure many investors in the second half of 2008 and thereafter that he was placing their funds in low-risk, secure investments such as corporate or government bonds, when as defendant FARAHI then well knew, that was not the case.

i.    Because of the magnitude of his trading losses in the second half of 2008, defendant FARAHI had to increase his efforts to raise money from investors and in fact successfully raised millions of dollars in additional funds.  However, defendant FARAHI did not disclose to NPFS investors that he had actually suffered huge trading losses in the fall of 2008, that he had used NPFS investor money to cover some of those losses, and that NPFS's and his ability to repay all of the NPFS investors was in jeopardy.  Instead, defendant FARAHI continued to assure many investors in the second half of 2008 and thereafter that he was placing their funds in low-risk, secure investments such as corporate or government bonds, when as defendant FARAHI then well knew, he was using investor funds for other undisclosed purposes, including paying back prior investors, financing his and his family's personal expenses, and continuing to engage in risky options trading.

j.    In some instances, defendant FARAHI recommended to investors that they purchase NPFS debentures not because their money would be invested in low-risk corporate or government bonds, but because their money would be invested in real estate transactions, either to purchase recently distressed properties

1  at low prices or to buy mortgages on properties with favorable
2  loan-to-value ratios.   In truth and in fact, as defendant FARAHI
3  then well knew, NPFS's investor funds were generally not used to
4  pursue the favorable opportunities in real estate he described,
5  but to make interest payments to and pay back prior NPFS
6  investors, to finance his and his family's expenses and
7  lifestyle, and to engage in high-risk options trading.

8       k.   Through defendant FARAHI's material
9  misrepresentations, false statements, omissions, and fraudulent
10  devices, described above, NPFS investors lost millions of
11  dollars.

12  **B.   The NPMB Investment Fraud**

13       l.   Defendant FARAHI also provided investors the
14  opportunity to invest in instruments offered by NPMB.  He told
15  prospective investors interested in NPMB's offering that their
16  funds would be used to finance the purchase and/or development of
17  valuable properties by third parties, and would be secured by
18  deeds of trust against the properties in the event that the third
19  parties were unable to repay the loans.   Investors were told, for
20  example, that their investment proceeds would be used to finance
21  a parcel of commercial real estate in Las Vegas, Nevada, or would
22  be loaned to an established real estate developer to improve
23  property that the developer owned in Las Vegas, Nevada.

24       m.   In truth and in fact, as defendant FARAHI then
25  well knew, defendant FARAHI did not use the investors' funds to
26  make loans to third parties to finance commercial real estate or
27  to develop a parcel of property, nor did he obtain deeds of trust
28  to protect investors' funds in the event of default.  In at least

7

1  one instance, defendant FARAHI provided an NPMB investor a
2  counterfeit deed of trust in a parcel of property allegedly owned
3  by an unrelated third party in order to lull the NPMB investor
4  into believing that the investor's $2.5 million investment was
5  fully secured by a valuable piece of property.  In fact, the
6  investor's $2.5 million investment was wholly unsecured and the
7  investment proceeds were not transferred to a Las Vegas property
8  developer as promised.

9          n.   In soliciting potential NPMB investors, defendant
10  FARAHI failed to disclose that he did not use their funds as
11  promised to finance loans, secured by deeds of trust, for the
12  purchase and/or development of real property.  Instead, defendant
13  FARAHI utilized NPMB investor funds for his own undisclosed
14  discretionary purposes, including paying the salaries of
15  employees at NPFS and the NewPoint Entities and funding an
16  assortment of personal and business expenses unrelated to the
17  stated investment activities of NPMB.

18          o.   In some instances in which NPMB investors were
19  entitled to full repayment of their investment principal
20  following the end of their initial investment term, defendant
21  FARAHI sought to persuade NPMB investors to reinvest for another
22  term and not seek full repayment of their principal.  Defendant
23  FARAHI did so by falsely reassuring these investors that their
24  principal was fully secured by deeds of trust and that they would
25  continue to receive favorable monthly interest payments against
26  their principal by extending their investment for another term.
27  These continuing interest disbursements operated as lulling
28  payments, designed to trick investors into declining to exercise

1 their rights to return of their investment principal and to

2 enable defendant FARAHI to retain control of NPMB investor funds.

3      p.   Through defendant FARAHI's material

4 misrepresentations, false statements, omissions, and fraudulent

5 devices, as described above, NPMB investors lost millions of

6 dollars.

7      c.   **The Parsi Investment Fraud**

8      q.   In or around October 2008, defendant FARAHI formed

9 a new limited liability corporation called Parsi.  Defendant

10 FARAHI offered some prospective investors the opportunity to

11 invest in Parsi.

12      r.   Starting in or about late-October 2008, and

13 continuing through in or about December 2008, a number of

14 potential investors came to meet defendant FARAHI seeking to

15 invest in the government and corporate bonds defendant FARAHI had

16 been recommending on his radio program.  Defendant FARAHI

17 proposed to some of these investors that, to accomplish this

18 purpose, they could place their investment funds in Parsi.

19      s.   Defendant FARAHI represented to investors that by

20 investing in Parsi they could obtain a secure rate of return

21 between 5 to 6 percent over a fixed term of six months to a year,

22 with full return of principal at the term's expiration.

23 Defendant FARAHI represented to Parsi investors that their money

24 would be invested in corporate bonds backed by the United States

25 government and that this was a safe, relatively low-risk

26 investment.  Defendant FARAHI further represented that he had

27 already invested a substantial portion of his own funds in this

28 type of corporate bond backed by the U.S. government.

1        t.   Contrary to defendant FARAHI's representations,
2  Parsi did not provide a safe and secure investment instrument for
3  its investors.  In truth and in fact, as defendant FARAHI then
4  well knew, defendant FARAHI had not already purchased low-risk
5  corporate or government bonds, and did not intend to do so.
6  Instead of buying bonds, defendant FARAHI used the Parsi investor
7  funds as collateral to obtain a secured $5 million personal line
8  of credit and to guarantee repayment of a pre-existing $7 million
9  unsecured personal line of credit at Bank of America.  After
10  defendant FARAHI failed to repay these personal lines of credit,
11  Bank of America seized the Parsi investor funds that defendant
12  FARAHI had pledged as collateral for his personal debts.

13        u.   In soliciting funds for investments in Parsi,
14  defendant FARAHI failed to disclose to investors that he had
15  engaged and was engaging in risky options trading that recently
16  had resulted in millions of dollars of losses, that he had
17  established Parsi in order to raise millions of additional
18  dollars to cover his trading losses, and that as a result of
19  these losses defendant FARAHI's and Parsi's ability to repay
20  Parsi investors was in jeopardy.  Further, defendant FARAHI
21  failed to disclose to Parsi investors, including those who were
22  considering renewing their investment or seeking return of their
23  investment, that he had pledged their funds as collateral for
24  defendant FARAHI's personal lines of credit.

25        v.   Through defendant FARAHI's material
26  misrepresentations, false statements, omissions, and fraudulent
27  devices, as described above, Parsi investors lost in excess of $1
28  million.

D.   **Borrowing Money From Banks to Extend the Scheme**

w.   After sustaining trading losses in his wife's brokerage account in excess of $30 million in the second half of 2008, defendant FARAHI needed additional money in order to make interest and principal payments to NPFS and NewPoint investors, as well as to pay his personal and business expenses and to continue to finance his options trading.

x.   In addition to raising money from new investors to cover these costs, defendant FARAHI also borrowed millions of dollars from federally insured banks, including Bank of America, located in Los Angeles, California; U.S. Bank, located in Reno, Nevada; and Sun West Bank, located in Reno, Nevada.

y.   Defendant FARAHI used this borrowed money from the banks to perpetuate the fraudulent scheme, by enabling him to make timely interest payments and principal payments to lull NPFS and Newpoint investors and to fund continued options trading.

III. **USE OF THE MAILS**

8.   On or about the dates set forth below, within the Central District of California and elsewhere, defendant FARAHI, assisted by others known and unknown to the Grand Jury, for the purpose of carrying out the scheme to defraud described above, caused the following items to be placed in an authorized depository for mail matter to be delivered by the United States Postal Service, and to be deposited with and delivered by a commercial interstate carrier, according to the directions thereon:

| COUNT | DATE | ITEM |
|-------|------|------|
| ONE | 1/19/2007 | Check from victim KM, dated 1/18/07, for $61,000 paid to NPFS via FedEx from NPFS in Beverly Hills, CA, to Sunwest Bank in Reno, NV |
| TWO | 8/13/2007 | Check from victim FH, dated 8/10/07, for $225,000 paid to NPMB via FedEx from NPMB in Beverly Hills, CA, to Sunwest Bank in Reno, NV |
| THREE | 9/12/07 | Two checks, from victim KM, dated 9/11/07, for a total of $200,000 paid to NPFS via FedEx from NPFS in Beverly Hills, CA, to Sunwest Bank in Reno, NV |
| FOUR | 1/28/08 | Check from victim HH, dated 1/28/08, for $300,000 paid to NPFS via FedEx from NPFS in Beverly Hills, CA, to Sunwest Bank in Reno, NV |
| FIVE | 6/30/2008 | Check from NPMB, dated 6/30/08, for $17,187.50 paid to victim YE via U.S. mail from NPMB in Beverly Hills, CA, to victim YE in Los Angeles, CA |
| SIX | 10/29/08 | Check from victim SM, dated 10/23/08, for $650,000 paid to Parsi via FedEx from Parsi in Beverly Hills, CA, to Sunwest Bank in Reno, NV |
| SEVEN | 11/05/2008 | Check from victim AT, dated 11/5/08, for $100,000 paid to NPFS via FedEx from NPFS in Beverly Hills, CA, to Sunwest Bank in Reno, NV |
| EIGHT | 11/12/2008 | Check from victim DK, dated 11/11/08, for $350,000 paid to NPFS via FedEx from NPFS in Beverly Hills, CA, to Sunwest Bank in Reno, NV |
| NINE | 11/17/2008 | Check from victim RE, dated 11/17/08, for $140,000 paid to NPFS via FedEx from NPFS in Beverly Hills, CA, to Sunwest Bank in Reno, NV |
| TEN | 11/25/2008 | Check from victim SH, dated 11/19/08, for $100,000 paid to NPFS via FedEx from NPFS in Beverly Hills, CA, to Sunwest Bank in Reno, NV |
| ELEVEN | 12/08/2008 | Check from victim HM, dated 12/8/08, for $1,000,000 paid to Parsi via FedEx from Parsi in Beverly Hills, CA, to Sunwest Bank in Reno, NV |

| COUNT | DATE | ITEM |
|--------|--------|------|
| TWELVE | 12/23/2008 | Check from victim SF, dated 12/20/08, for $100,000 paid to NPFS via FedEx from NPFS in Beverly Hills, CA, to Sunwest Bank in Reno, NV |
| THIRTEEN | 12/26/2008 | Two checks from victim MF, dated 12/26/08, totaling $100,000 paid to NPFS via U.S. mail from MF in Murietta, CA, to NPFS in Beverly Hills, CA |
| FOURTEEN | 1/13/2009 | Check from victim SH, dated 1/12/2009, for $300,000 paid to NPFS via FedEx from NPFS in Beverly Hills, CA, to Sunwest Bank in Reno, NV |
| FIFTEEN | 1/16/2009 | Two checks from victim EP, dated 1/16/09, totaling $300,000 paid to NPFS via FedEx from NPFS in Beverly Hills, CA, to Sunwest Bank in Reno, NV |
| SIXTEEN | 4/22/2009 | Check from victim SH, dated 4/20/09, for $300,000 paid to NPFS via FedEx from NPFS in Beverly Hills, CA, to Sunwest Bank in Reno, NV |

1          COUNT SEVENTEEN

2          [18 U.S.C. § 1343]

3     9.    The Grand Jury hereby repeats and realleges paragraphs

4   1-5 and 7 of this Indictment as if fully set forth herein.

5     10.   Beginning on a date unknown to the Grand Jury but at

6   least as early as in or about November 2005, and continuing to in

7   or about April 2009, in Los Angeles County, within the Central

8   District of California, and elsewhere, defendant FARAHI, together

9   with and aided and abetted by others known and unknown to the

10  Grand Jury, knowingly and with the intent to defraud, devised,

11  participated in, and executed a scheme to defraud victim

12  investors of NPFS, NPMB, and Parsi as to material matters, by

13  depriving victim investors of money and property, and by

14  obtaining from the victim investors' money and property by means

15  of materially false and fraudulent pretenses, representations,

16  and promises, and the concealment of material facts.  The

17  fraudulent scheme was carried out in substance in the manner set

18  forth in paragraph 7 of this Indictment.

19    11.   On or about February 5, 2009, within the Central

20  District of California and elsewhere, defendant FARAHI, assisted

21  by others known and unknown to the Grand Jury, for the purpose of

22  carrying out the scheme to defraud described above, caused the

23  following to be transmitted by means of wire and radio

24  communication in interstate commerce: $230,000 of victim SF's

25  funds wired from a Bank of America account in New York, NY, to

26  NPFS's account at Sunwest Bank in Reno, NV.

27

28

14

COUNT EIGHTEEN

[18 U.S.C. § 1014]

12.   Between in or about mid-November 2008, and in or about mid-December 2008, in Los Angeles County, within the Central District of California and elsewhere, defendant JOHN FARAHI ("FARAHI") knowingly made material false statements for the purpose of influencing the actions of U.S. Bank, an institution the accounts of which were then insured by the Federal Deposit Insurance Corporation, in connection with the renewal of a personal line of credit with U.S. Bank, in that defendant FARAHI informed U.S. Bank that: (1) his options trading did not present untoward risk to U.S. Bank because since September 2008 he had taken effective steps to reduce his trading risk and to counter extreme volatility in the markets; and (2) under his option trading strategy, the maximum possible loss he could sustain trading options in any given month was between $1 to $1.5 million, when in truth and in fact, as defendant FARAHI then well knew, (1) he had failed effectively to hedge his trading risks and counter extreme volatility in the markets in the fall of 2008; and (2) under his option strategy he could lose, and in fact did lose, substantially more than $1.5 million in a month trading options.

COUNT NINETEEN

[18 U.S.C. § 1014]

13.   In or about mid-December 2008, in Los Angeles County, within the Central District of California and elsewhere, defendant JOHN FARAHI ("FARAHI") knowingly made material false statements for the purpose of influencing the actions of Sun West Bank, an institution the accounts of which were then insured by the Federal Deposit Insurance Corporation, in connection with the renewal of a personal line of credit with Sun West Bank, in that defendant FARAHI informed Sun West Bank that: (1) in the fall of 2008 he had anticipated the market correction and was well-positioned by hedging against market volatility; and (2) he had achieved profits in his trading account in 2008 similar to the $3.7 million in profits he achieved in 2006 and 2007, when in truth and in fact, as defendant FARAHI then well knew, (1) in the fall of 2008 he had failed to anticipate the magnitude of the market correction, and (2) in 2008 he had sustained losses in his principal trading account in excess of $15 million.

COUNT TWENTY

[18 U.S.C. § 1014]

14.   On or about February 10, 2009, in Los Angeles County, within the Central District of California, defendant JOHN FARAHI ("FARAHI") knowingly made a material false statement for the purpose of influencing the actions of Bank of America, an institution the accounts of which were then insured by the Federal Deposit Insurance Corporation, in connection with the upcoming renewal of a personal line of credit with Bank of America, in that defendant FARAHI certified in writing to Bank of America that his submitted statement of financial condition, dated July 31, 2008, was a true, complete, and substantially correct statement of his financial condition as of February 10, 2009, when in truth and in fact, as defendant FARAHI then well knew, his submitted statement of financial condition substantially understated his liabilities and overstated his net worth as of February 10, 2009 by, among other things, failing to list outstanding debts in excess of $7 million to U.S. Bank, Sunwest Bank, and a number of other creditors.

17

## COUNT TWENTY-ONE

[18 U.S.C. § 1014]

15.   Between in or about mid-March 2009, and in or about mid-May 2009, in Los Angeles County, within the Central District of California and elsewhere, defendant JOHN FARAHI ("FARAHI") knowingly made material false statements for the purpose of influencing the actions of U.S. Bank, an institution the accounts of which were then insured by the Federal Deposit Insurance Corporation, in connection with the renewal of a personal line of credit with U.S. Bank, in that defendant FARAHI informed U.S. Bank with respect to $5 million he had drawn down on his personal line of credit at U.S. Bank that: (1) he was unable to pay U.S. Bank back because he had invested the $5 million in a commercial real estate project on Wilshire Boulevard in Los Angeles, California that was tied up in a Chapter 11 bankruptcy, and that the funds could not be retrieved from escrow; and (2) he was negotiating the sale of a portion of his interest in this commercial real estate project to another investor for $2 million, when in truth and in fact, as defendant FARAHI then well knew, (1) he had not invested $5 million in the above-described commercial real estate project, and (2) he was not negotiating to sell a portion of this project to another investor for $2 million.

18

COUNTS TWENTY-TWO THROUGH TWENTY-SIX

[15 U.S.C. §§ 77e(a)(1) and (2) and 77x; 18 U.S.C. § 2(b)]

16.  The Grand Jury hereby repeats and realleges paragraphs 1-5 and 7 of this Indictment as if fully set forth herein.

17.  On or about the following dates, in the Central District of California, and elsewhere, defendant JOHN FARAHI, directly and indirectly, aided and abetted by others known and unknown to the Grand Jury, willfully (1) used and caused to be used the means and instruments of transportation and communication in interstate commerce and the mails to sell the following securities, and (2) carried and caused to be carried through the mails and in interstate commerce, by means and instruments of transportation, the following securities for the purpose of sale and for delivery after sale, in violation of law, as no registration statements were filed with the Securities and Exchange Commission and in effect as to such securities:

| COUNT | DATE | SALE/DELIVERY OF UNREGISTERED SECURITIES THROUGH THE MAILS |
|-------|------|-----------------------------------------------------------|
| TWENTY-TWO | 12/4/07 | Debenture Certificate of NPFS to SH |
| TWENTY-THREE | 11/25/08 | Debenture Certificate of NPFS to SH |
| TWENTY-FOUR | 1/5/09 | Debenture Certificate of NPFS to MF |
| TWENTY-FIVE | 1/21/09 | Debenture Certificate of NPFS to EP and FR |
| TWENTY-SIX | 1/23/09 | Debenture Certificate of NPFS to HR and SH |

COUNT TWENTY-SEVEN

[18 U.S.C. §§ 371, 1512(k)]

I.   **INTRODUCTORY ALLEGATIONS**

18.   The Grand Jury hereby repeats and realleges paragraphs 1-7 and 17 of this Indictment as if fully set forth herein.

19.   Defendant DAVID TAMMAN ("TAMMAN") was a lawyer licensed to practice law in the state of California who specialized in corporate transactions and securities law matters.   Between 2003 and 2007, he was an associate at Law Firm #1.   In 2007, he left Law Firm #1 and became a partner at Law Firm #2.   From in or about 2003 to 2009, defendant TAMMAN provided legal and other services to NPFS and in that context he regularly communicated with defendant FARAHI as the owner and president of NPFS.

A.   **Defendant TAMMAN's Preparation of Private Placement Memoranda for NPFS's Sale of Unregistered Debentures in Connection with the 2003 Offering**

20.   NPFS did not register the securities it sold, known as debentures, with the Securities and Exchange Commission ("S.E.C."), an agency of the United States.   By no later than 2003, defendants FARAHI and TAMMAN knew that in order to lawfully sell the unregistered debentures, NPFS had to follow certain securities rules and regulations that required, amongst other things, that NPFS provide certain investors with all material information they needed to know about their investment through a private placement memorandum ("PPM") or through other means.

21.   Beginning no later than 2003, defendant FARAHI and NPFS took steps to make it appear that NPFS was complying with the securities laws and regulations pertaining to unregistered securities.   One of those steps was hiring defendant TAMMAN and

20

1  his law firms to prepare PPMs for the debentures, which purported

2  to make the necessary disclosures to investors to comply with the

3  S.E.C.'s rules for selling unregistered securities.

4      22.   In connection with a purported May 1, 2003 debenture

5  offering by NPFS, defendant TAMMAN prepared a PPM ("Original May

6  1, 2003 PPM").  The Original May 1, 2003 PPM did not disclose

7  that defendant FARAHI was going to use the money raised through

8  the debentures to pay substantial personal expenses, to pay back

9  prior investors, to provide gifts and loans to defendant FARAHI's

10 friends and family, or to finance high-risk and speculative

11 future option trades.  Instead, the Original May 1, 2003 PPM

12 stated the investors' money would be used for other purposes,

13 including real estate, and would be deposited into an escrow

14 account.  The Original May 1, 2003 PPM also did not disclose all

15 the material risks and other material facts relating to the

16 investment.

17     23.   From no later than in or about May 2003, to in or about

18 October 2008, defendant FARAHI, through NPFS, raised tens of

19 millions of dollars from investors through the debenture

20 offering.  Many of these investors never received a PPM of any

21 kind pertaining to the debentures.

22 B.   **Defendant TAMMAN's Preparation of a New PPM for NPFS in**
23      **2008 and 2009 for a New, Future Debenture Offering**

24     24.   Beginning in or about November 2008, and continuing

25 through on or about April 12, 2009, defendant TAMMAN and other

26 lawyers at Law Firm #2 worked on a new PPM for a new, future

27 debenture offering by NPFS.  In or around this same time period,

28 defendant FARAHI disclosed to defendant TAMMAN and other lawyers

1   at Law Firm #2 that he intended to personally borrow a large
2   portion of the money raised from the new debenture offering and
3   use most of the remaining money to pay back prior investors and
4   to pay off other debts.   In or around November 2008, lawyers at
5   Law Firm #2 added language to the new draft PPM that disclosed
6   that a portion of the investors' money would be used to pay back
7   prior investors and other debts.   In or about March 2009, lawyers
8   at Law Firm #2 added language to the draft PPM that for the first
9   time disclosed that a portion of the investors' money would be
10  used for "Loans to John Farahi."

11       25.   As of April 12, 2009, the PPM for the new NPFS
12  debenture offering had not been finalized.   The most recent
13  version of the memorandum in existence on April 12, 2009 was
14  dated "March ___, 2009" and had multiple blanks in the document
15  that still needed to be filled in.

16       C.   **Defendant FARAHI Sells Debentures Without a PPM and the**
17            **SEC Investigates Defendant FARAHI and his Businesses**

18       26.   Between on or about October 1, 2008, and continuing
19  through at least on or about April 12, 2009, defendant FARAHI,
20  through NPFS, raised millions of dollars from investors by
21  issuing debentures, even though Law Firm #2 had not completed the
22  new PPM.   Many, if not all, of the investors who provided money
23  to NPFS were never provided PPMs before purchasing the
24  debentures.

25       27.   On or about April 13, 2009, the S.E.C. conducted a
26  surprise inspection of NewPoint Securities, LLC and began
27  investigating Newpoint, defendant FARAHI, defendant FARAHI's wife
28  ("GF"), and Amouei.   On or about June 4, 2009, the S.E.C. opened

22

1  up a formal investigation entitled In the Matter of NewPoint
2  Securities, LLC, Commission File No. LA-3663 ("S.E.C. Formal
3  Investigation").  Among the matters the S.E.C. was investigating
4  was whether NPFS, defendant FARAHI, GF, and Amouei sold
5  unregistered securities, failed to give debenture investors full
6  and proper disclosures, failed to provide PPMs to debenture
7  investors, and altered and/or fabricated PPMs and other
8  documents.

9      28.  As part of its investigation, the S.E.C. requested and
10  subpoenaed documents from NPFS.  Those requests and subpoenas
11  sought documents pertaining to NPFS's debenture offerings, the
12  PPMs, and what NPFS did with the investors' money.  The S.E.C.
13  also issued subpoenas seeking the testimony of defendant FARAHI,
14  defendant TAMMAN, GF, Amouei, and others and seeking documents
15  from NPFS and defendant FARAHI.

16  II.  **THE OBJECTS OF THE CONSPIRACY**

17      29.  Beginning on or about at least April 13, 2009, and
18  continuing through at least on or about November 2009, in Los
19  Angeles County, within the Central District of California, and
20  elsewhere, defendants FARAHI and TAMMAN, co-conspirator Amouei,
21  and others known and unknown to the Grand Jury, knowingly
22  combined, conspired, and agreed to commit the following offenses
23  against the United States:

24          a.  to corruptly obstruct, influence, and impede, and
25  attempt to obstruct, influence, and impede, an official
26  proceeding, which need not be pending or about to be instituted
27  at the time of the offense, in violation of Title 18, United
28  States Code, Section 1512(c)(2); and

b.    to knowingly alter, destroy, mutilate, conceal, cover up, falsify, and make a false entry in any record, document, or tangible object with the intent to impede, obstruct, and influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States, and in relation to and contemplation of any such matter, in violation of Title 18, United States Code, Section 1519.

III. **THE MANNER AND MEANS OF THE CONSPIRACY**

30.   The objects of the conspiracy were carried out, and to be carried out, in substance, as follows:

a.    In anticipation of and in response to S.E.C. document requests and subpoenas seeking NPFS's PPMs and related documents, defendants TAMMAN and FARAHI altered and created NPFS PPMs and supplements to the PPMs to make it falsely appear to the S.E.C. that defendant FARAHI and NPFS had made all the necessary disclosures to their investors to comply with federal law.

b.    In anticipation of and in response to S.E.C. document requests and subpoenas seeking NPFS's financial records, defendants TAMMAN and FARAHI created and altered promissory notes and other documents to make it appear to the S.E.C. that defendant FARAHI had transferred investor funds from NPFS to defendant FARAHI's personal accounts and defendant FARAHI's entities' accounts based upon pre-existing written loan agreements, when in truth and in fact, as defendants FARAHI and TAMMAN then well knew, defendant FARAHI had transferred the money from NPFS to use for his own purposes without any written loan agreements.

24

c.   Defendants TAMMAN and FARAHI knowingly provided false and misleading information and documents to NPFS's lawyer ("SS") in order for SS to communicate that information and provide those documents to the S.E.C.

d.   Defendant FARAHI, co-conspirator Amouei, and others removed certain documents from NPFS's files that had been requested and subpoenaed by the S.E.C.

e.   Defendant FARAHI instructed co-conspirator Amouei, KS, ET, and others to lie to the S.E.C. and others to make it falsely appear that defendant FARAHI, NPFS, Amouei, and GF were complying with federal law and not defrauding investors.

f.   Defendant FARAHI and co-conspirator Amouei gave materially false, misleading, and evasive testimony under oath before the S.E.C. in the S.E.C. Formal Investigation to make it falsely appear that defendant FARAHI, NPFS, and GF were complying with federal law and not defrauding investors.

g.   Defendant FARAHI and co-conspirator Amouei had investors sign and backdate documents to make it falsely appear to the S.E.C. and other government investigators that defendant FARAHI, NPFS, Amouei, and GF were complying with federal law and not defrauding investors.

IV.   **OVERT ACTS**

31.   In furtherance of the conspiracy, and to accomplish its objects, defendant FARAHI, defendant TAMMAN, co-conspirator Amouei, and others known and unknown to the Grand Jury, committed and willfully caused others to commit the following overt acts, among others, in the Central District of California and elsewhere:

<u>Overt Act No. 1</u>: On or about April 13, 2009, defendant FARAHI met with defendant TAMMAN and informed him that the S.E.C. was at defendant FARAHI's offices.

<u>Overt Act No. 2</u>: After meeting with defendant FARAHI on or about April 13, 2009, defendant TAMMAN made alterations to the draft NPFS PPM.

<u>Overt Act No. 3</u>: After making the alterations to the NPFS draft PPM on or about April 13, 2009, defendant TAMMAN e-mailed the altered PPM to defendant FARAHI.

<u>Overt Act No. 4</u>: On or about April 13, 2009, defendant TAMMAN directed MG, a lawyer at Law Firm #2, to prepare a promissory note (<u>i.e.</u>, a loan document), showing that defendant FARAHI had borrowed money from NPFS.

<u>Overt Act No. 5</u>: After MG prepared the promissory note to defendant TAMMAN's specifications, defendant TAMMAN backdated the promissory note from "April __, 2009" to "October 1, 2008."

<u>Overt Act No. 6</u>: At some time between April 13, 2009 and July 8, 2009, and in response to and anticipation of the S.E.C.'s subpoena and document requests, defendant FARAHI, Amouei, and NT removed documents from NPFS's files, including documents indicating that investor money was being invested in corporate bonds.

<u>Overt Act No. 7</u>: On or about April 30, 2009, defendant TAMMAN made additional changes to the PPM that was now dated October 1, 2008.

<u>Overt Act No. 8</u>: On or about May 14, 2009, defendant TAMMAN made multiple changes to the Old May 1, 2003 PPM, including but not limited to the following:

1          •      Adding disclosures that millions of dollars of the

2    investors' money would be "loaned" to John Farahi.

3          •      Adding a section stating there was a promissory

4    note reflecting these loans.

5          •      Deleting the language stating that investor funds

6    were to be put in a trust account.

7          •      Deleting the language stating that none of the

8    investors' money will be invested in securities.

9         Overt Act No. 9: On or about May 18, 2009, defendant TAMMAN

10   e-mailed defendant FARAHI the revised May 1, 2003 PPM and the

11   revised October 1, 2008 PPM.

12        Overt Act No. 10: On or about June 3, 2009, defendant TAMMAN

13   made additional changes to the recently revised May 1, 2003 PPM,

14   saving the document under the title "03_PPM_(post-finra)."

15        Overt Act No. 11: On or about June 3, 2009, defendant TAMMAN

16   altered an old version of a NPFS PPM dated May 1, 2003 and saved

17   the document under the title "03_PPM_(pre-finra)."

18        Overt Act No. 12: On or about June 3, 2009, defendant TAMMAN

19   created a "Supplement" to the May 1, 2003 PPM, dating it "April

20   20, 2006," and saving it under the title "06_PPM_Supplement."

21        Overt Act No. 13: On or about June 3, 2009, defendant TAMMAN

22   made an additional change to the revised October 1, 2008 PPM,

23   saving the document under the title "08_PPM."

24        Overt Act No. 14:  On or about June 3, 2009, defendant

25   TAMMAN e-mailed the four documents he revised and created that

26   day, namely, "03_PPM_(pre-finra),""03_PPM_(post-finra),"

27   "06_PPM_Supplement," and "08_PPM" (collectively, the "Four

28   Altered Documents"), to defendant FARAHI.

<u>Overt Act No. 15</u>: On or about June 3, 2009, defendant FARAHI made additional changes to the Four Altered Documents defendant TAMMAN e-mailed him that day.

<u>Overt Act No. 16</u>: On or about June 4, 2009, defendant FARAHI provided the Four Altered Documents with the changes he made to SS so that SS could provide them to the S.E.C.

<u>Overt Act No. 17</u>: On or about June 5, 2009, in response to SS's question asking when the May 1, 2003 PPM was revised, defendant TAMMAN falsely told SS that the PPM was revised in "early 2005 – i.e., January or February 2005," notwithstanding the fact that defendant TAMMAN had revised that document several times in the past month.

<u>Overt Act No. 18</u>: On or about June 8, 2009, defendant TAMMAN, in response to an e-mail from SS, directed his assistant to correct the page numbering on the Four Altered Documents and then e-mail them to SS.

<u>Overt Act No. 19</u>: On or about June 8, 2009, defendant FARAHI caused SS to provide the Four Altered Documents to the S.E.C.

<u>Overt Act No. 20</u>: On or about July 8, 2009, defendant FARAHI caused SS to provide another copy of the Four Altered Documents to the S.E.C.

<u>Overt Act No. 21</u>: On or about July 8, 2009, defendant FARAHI caused SS to provide the S.E.C. with multiple backdated and forged promissory notes purportedly showing that when defendant FARAHI transferred millions of dollars from NPFS to his personal accounts and his entities he was "borrowing" that money.

<u>Overt Act No. 22</u>: After defendant TAMMAN was informed that the S.E.C. wanted electronic versions of the Four Altered

Documents with metadata, on or about July 16, 2009, defendant
TAMMAN directed the computer staff at Law Firm #2 to "scrub" the
metadata from the Four Altered Documents as well as from the
promissory note created on April 13, 2009.

Overt Act No. 23: On or about July 16, 2009, defendant
TAMMAN e-mailed the "scrubbed" documents to SS.

Overt Act No. 24: In or around July or August 2009,
defendant FARAHI called an NPFS investor ("ET"), informing ET
that someone might be calling ET to ask questions about ET's
investment at NPFS and instructing ET to falsely tell them that
ET had received all the paperwork about which they were
inquiring, including a PPM.

Overt Act No. 25: On or about August 4, 2009, defendant
FARAHI gave materially false, misleading, and evasive testimony
under oath before the S.E.C. regarding, among other things, the
creation date of PPMs, whether NPFS had electronic copies of
PPMs, and whether defendant FARAHI communicated with defendant
TAMMAN through e-mail.

Overt Act No. 26: Between on or about August 13, 2009, and
on or about August 31, 2009, defendant FARAHI told Amouei to
falsely testify before the S.E.C. that a PPM was given to every
NPFS investor and that a PPM and completed investor questionnaire
was mailed to all the investors, even though defendant FARAHI and
Amouei knew that was not true.

Overt Act No. 27: On or about August 31, 2009, Amouei,
acting at defendant FARAHI's direction, gave materially false and
misleading testimony under oath before the S.E.C. regarding
whether NPFS investors received PPMs.

29

1    <u>Overt Act No. 28</u>: On or about September 2, 2009, defendant

2    FARAHI gave materially false, misleading, and evasive testimony

3    under oath before the S.E.C. regarding, among other things,

4    disclosures made to investors, the creation date of PPMs, whether

5    investors received PPMs, whether TAMMAN e-mailed him draft PPMs,

6    and the creation dates of promissory notes.

7    <u>Overt Act No. 29</u>: On or about September 3, 2009, defendant

8    FARAHI gave materially false, misleading, and evasive testimony

9    under oath before the S.E.C. regarding, among other things,

10   disclosures made to investors, the creation date of PPMs,

11   whether investors received PPMs, and whether investors received

12   debentures.

13   <u>Overt Act No. 30</u>: In or around November 2009, defendant

14   FARAHI told a computer technician ("KS") that defendant FARAHI

15   needed KS's help to backdate computer files that were being

16   reviewed by the S.E.C. and that defendant FARAHI wanted KS to

17   make the computer files that were recently created look like they

18   were created years earlier.

19

20

21

22

23

24

25

26

27

28

COUNTS TWENTY-EIGHT THROUGH THIRTY-TWO

[18 U.S.C. §§ 1519, 2]

32. The Grand Jury hereby repeats and realleges paragraphs 1-7, 19-28, and 30-31 of this Indictment as if fully set forth herein.

33. Beginning on or about April 13, 2009, and continuing to at least on or about July 16, 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendants FARAHI and TAMMAN, aiding and abetting each other and aided and abetted by others known and unknown to the Grand Jury, knowingly altered, mutilated, concealed, covered up, falsified, and made false entries in and willfully caused the alteration, concealment, mutilation, concealment, covering up, falsification, and making of false entries in, the records, documents, and tangible objects described below with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, specifically, the S.E.C., and in relation to and contemplation of such a matter:

| COUNT | DOCUMENT, RECORD, TANGIBLE OBJECT |
|---|---|
| TWENTY-EIGHT | NPFS PPM dated May 1, 2003 ("pre-FINRA" version) |
| TWENTY-NINE | NPFS PPM dated May 1, 2003 ("post-FINRA" version) |
| THIRTY | NPFS PPM dated October 1, 2008 |
| THIRTY-ONE | Supplement to NPFS PPM dated April 30, 2006 |
| THIRTY-TWO | $8,000,000 Amended and Restated Revolving Note dated October 1, 2008 |

31

COUNT THIRTY-THREE

[18 U.S.C. § 3]

34.   Beginning on or about April 13, 2009, and continuing to at least in or about November 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendant DAVID TAMMAN, knowing that an offense against the United States has been committed, namely, mail fraud in violation of 18 U.S.C. § 1341, as described in paragraphs one through eight above, and securities law offenses, in violation of 15 U.S.C. §§ 77e and 77x, as described in paragraphs sixteen and seventeen above, received, relieved, comforted and assisted the offenders, including John Farahi and NPFS, in order to hinder and prevent the offenders' apprehension, trial, and punishment, in violation of Title 18, United States Code, Section 3.

## COUNT THIRTY-FOUR

[18 U.S.C. §§ 1001(a)(1), 2(b)]

35. The Grand Jury hereby repeats and realleges paragraphs 1-7, 19-28, and 30-31 of this Indictment as if fully set forth herein.

36. On or about July 16, 2009, in Los Angeles County, within the Central District of California, and elsewhere, in a matter within the jurisdiction of the executive branch of the government of the United States, specifically, the Securities and Exchange Commission, defendant FARAHI knowingly and willfully falsified, concealed, and covered up by trick, scheme, and device a material fact, in that the defendant FARAHI knowingly and willfully caused SS to produce to the Securities and Exchange Commission false, fraudulent, altered, and forged promissory notes, loan agreements, pledge and security agreements, and other loan documents. By causing SS to produce these documents to the S.E.C., defendant FARAHI falsified, concealed, and covered up the material fact that when defendant FARAHI transferred millions of dollars from NPFS and NewPoint Entities to himself, to entities he controlled, to friends, and to relatives, these monies were not  transferred pursuant to pre-existing, written loan documents and agreements.

33

COUNT THIRTY-FIVE

[18 U.S.C. §§ 1028A, 2(b)]

37.   The Grand Jury hereby repeats and realleges paragraphs 1-7, 19-28, and 30-31 of this Indictment as if fully set forth herein.

38.   On or about July 16, 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendant FARAHI knowingly transferred, possessed, and used, and willfully caused others to knowingly transfer, possess, and use, without lawful authority, a means of identification of another person, that is, the name of PB, which defendant FARAHI knew belonged to another person, during and in relation to falsifying, concealing, and covering up a material fact, a felony violation of Title 18, United States Code, Section 1001(a)(1), as charged in Count Thirty-Four, above.

34

COUNT THIRTY-SIX

[18 U.S.C. §§ 1512(c)(2), 2(a)]

39.   The Grand Jury hereby repeats and realleges paragraphs 1-7, 19-28, and 30-31 of this Indictment as if fully set forth herein.

40.   On or about August 4, 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendant FARAHI, aided and abetted by defendant TAMMAN, corruptly obstructed, influenced, and impeded, and attempted to obstruct, influence, and impede an official proceeding, namely, the S.E.C. Formal Investigation, by giving materially false, misleading, and evasive testimony under oath before the S.E.C. Among the materially false, misleading, and evasive testimony he gave that day, defendant FARAHI testified that:

• The 2003 PPM was revised around the end of 2004/beginning of 2005, when in truth and in fact, as defendant FARAHI then well knew, the 2003 PPM was revised in 2009;

• He did not think he ever corresponded with defendant TAMMAN through e-mail, when in truth and in fact, as defendant FARAHI then well knew, defendant FARAHI had corresponded with defendant TAMMAN through e-mail, including by sending each other altered and newly created versions of the PPM;

• NPFS had no electronic copies of the 2003 PPM, when in truth and in fact, as defendant FARAHI well knew, NPFS did have an electronic copy of the 2003 PPM; and

• NPFS had no electronic copies of the 2008 PPM, when in truth and in fact, as defendant FARAHI well knew, NPFS did have an electronic copy of the 2008 PPM.

35

COUNT THIRTY-SEVEN

[18 U.S.C. §§ 1512(c)(2), 2(a)]

41. The Grand Jury hereby repeats and realleges paragraphs 1-7, 19-28, and 30-31 of this Indictment as if fully set forth herein.

42. On or about September 2, 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendant FARAHI, aided and abetted by defendant TAMMAN, corruptly obstructed, influenced, and impeded, and attempted to obstruct, influence, and impede an official proceeding, namely, the S.E.C. Formal Investigation, by giving materially false, misleading, and evasive testimony under oath before the S.E.C.

43. Among the materially false, misleading, and evasive testimony he gave that day, defendant FARAHI testified that:

a. Before all prospective NPFS investors invested in the debentures, defendant FARAHI orally told the prospective investors that the debentures were a high-risk investment, when in truth and in fact, as defendant FARAHI then well knew, defendant FARAHI did not orally tell all of NPFS's prospective investors that the debentures were a high-risk investment.

b. Defendant FARAHI orally disclosed to all prospective NPFS investors who he did not see reviewing PPMs that the investors could lose all their money, when in truth and in fact, as defendant FARAHI then well knew, defendant FARAHI did not tell all NPFS investors whom he did not see reviewing PPMs that they could lose all their money.

c. Every investor in the 2003 debenture offering received a copy of a PPM, when in truth and in fact, as defendant

36

1   FARAHI then well knew, every investor in the 2003 debenture

2   offering had not received a copy of a PPM.

3          d.   The 2003 PPM was revised sometime during 2004 or

4   2005, when in truth and in fact, as defendant FARAHI then well

5   knew, the 2003 PPM was revised in 2009.

6          e.   He did not remember if defendant TAMMAN ever sent

7   him an e-mail with a draft of the PPM, when in truth and in fact,

8   as defendant FARAHI then well knew, defendant FARAHI did remember

9   that defendant TAMMAN sent him e-mails with a draft PPM.

10         f.   The $6 million promissory note, dated January 1,

11  2004, that was given to the S.E.C. was drafted around January 1,

12  2004, and was not backdated, when, in truth and in fact, as

13  defendant FARAHI then well knew, this promissory note was not

14  drafted around January 1, 2004 and was backdated.

15         g.   The $8 million promissory note, dated October 1,

16  2008, that was given to the S.E.C. was drafted around October 1,

17  2008, when, in truth and in fact, as defendant FARAHI then well

18  knew, this promissory note was not drafted around October 1,

19  2008.

20

21

22

23

24

25

26

27

28

37

COUNT THIRTY-EIGHT

18 U.S.C. §§ 1512(c)(2), 2(a)]

44.   The Grand Jury hereby repeats and realleges paragraphs 1-7, 19-28, and 30-31 of this Indictment as if fully set forth herein.

45.   On or about September 3, 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendant FARAHI, aided and abetted by defendant TAMMAN, corruptly obstructed, influenced, and impeded, and attempted to obstruct, influence, and impede an official proceeding, namely, the S.E.C. Formal Investigation, by giving materially false, misleading, and evasive testimony under oath before the S.E.C.

46.   Among the materially false, misleading, and evasive testimony he gave that day, defendant FARAHI testified that:

      a.   Defendant FARAHI told all of the investors in the 2008 debentures that the debentures were a high-risk investment, when in truth and in fact, as defendant FARAHI then well knew, defendant FARAHI did not tell all of the investors in the 2008 debentures that the debentures were a high-risk investment.

      b.   Defendant FARAHI always told the debenture investors that they could lose their entire investment, when in truth and in fact, as defendant FARAHI then well knew, defendant FARAHI did not always tell debenture investors that they could lose their entire investment.

      c.   Defendant FARAHI never told anybody that their investment was safe or that they could not lose money, when in truth and in fact, as defendant FARAHI then well knew, defendant

38

1   FARAHI had told investors their investment was safe and had told

2   investors that they could not lose money.

3        d.   The PPM dated October 1, 2008 that was given to the

4   S.E.C. was completed in either October 2008 or before October

5   2008, when in truth and in fact, as defendant FARAHI then well

6   knew, that document was not completed until sometime in 2009,

7   after the S.E.C. began its investigation.

8        e.   All of the investors in the 2008 debenture offering

9   were provided a copy of the PPM dated October 1, 2008 that was

10  given to the S.E.C., when in truth and in fact, as defendant

11  FARAHI then well knew, all of the investors in the 2008 debenture

12  offering were not provided with a copy of that document.

13       f.   When people invested, they were given copies of

14  debentures, when in truth and in fact, as defendant FARAHI then

15  well knew, people who invested were not given copies of

16  debentures.

17

18

19

20

21

22

23

24

25

26

27

28

COUNT THIRTY-NINE

[18 U.S.C. §§ 1512(c)(2)]

47.   The Grand Jury hereby repeats and realleges paragraphs 1 through 5 of this Indictment as if fully set forth herein.

48.   On or about January 8, 2010, the Securities and Exchange Commission ("S.E.C.") filed a civil action against defendant FARAHI, his wife, and Amouei, in federal district court in Los Angeles, California, entitled <u>Securities and Exchange Commission v. NewPoint Financial Services, Inc. et al.,</u> CV-10-1024-DDP ("S.E.C. Action").

49.   In connection with the S.E.C. Action, on or about January 8, 2010, and on or about March 17, 2010, a federal district court judge issued orders requiring defendant FARAHI to, among other things:

a.   provide the court-appointed receiver within 24 hours a detailed schedule of all computers, laptops, and other digital devices, owned, controlled, or used by defendant FARAHI for any purpose, and to allow the receiver to make copies of the contents of these devices;

b.   prepare and deliver to the S.E.C. a complete and detailed schedule of all his and GF's assets, including all real and personal property valued over $5,000, and to produce to the S.E.C. the supporting documentation for the schedule; and

c.   not destroy, alter, transfer, or conceal any books, records, computer files, or anything else pertaining to defendant FARAHI, his wife, Amouei, and the NewPoint entities.

50.   On or about March 29, 2010, in Los Angeles County, within the Central District of California, and elsewhere,

40

defendant FARAHI corruptly obstructed, influenced, and impeded, and attempted to obstruct, influence, and impede an official proceeding, namely, the S.E.C. Action, by giving materially false, misleading, and evasive testimony under oath in a deposition taken in the S.E.C. Action regarding defendant FARAHI's laptop computer and attempted to convince a person to make knowingly and materially false statements to the S.E.C. about defendant FARAHI's laptop computer.

51. In particular, on or about March 29, 2010, defendant FARAHI testified under oath (1) that in November or December 2009, while at his house, defendant FARAHI poured coffee on one of his laptop computers and, as a result, that laptop "burned out;" (2) that after defendant FARAHI poured coffee on the computer, defendant FARAHI called KS, a computer technician, and asked him to come over to look at the computer; (3) that KS came over, inspected the computer, and concluded that the computer was "shot;" and (4) that KS then left with the computer, when in truth and in fact, as defendant FARAHI then well knew, KS did not come look at defendant FARAHI's computer, did not conclude the computer was shot, and did not leave with the computer.

52. It is additionally alleged that shortly after defendant FARAHI concluded his testimony, defendant FARAHI called KS and told him that the S.E.C. would be calling KS and KS should tell the S.E.C. that defendant FARAHI spilled coffee on his laptop computer in November or December 2009 and that KS picked up the computer and disposed of it, even though KS had not picked up and disposed of any laptop computer in November or December 2009 and

1    was unaware of defendant FARAHI ever spilling coffee on his

2    computer during that time period.

COUNT FORTY

[18 U.S.C. § 1622]

53.   The Grand Jury hereby repeats and realleges paragraphs 1-7, 19-28, 30-31 of this Indictment as if fully set forth herein.

54.   On or before August 31, 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendant FARAHI willfully suborned and procured Amouei to commit perjury by testifying falsely under oath to a material matter in the S.E.C. Formal Investigation.

55.   It was material to the S.E.C. and the S.E.C. Formal Investigation whether: (1) all of the investors of NPFS received PPMs; and (2) the investors who renewed their investments at NPFS received PPMs.

56.   Defendant FARAHI willfully suborned and procured Amouei to testify falsely under oath on or about August 31, 2009 in the SEC Formal Investigation that: (1) all investors of NPFS received a package containing a PPM, when in truth and in fact, as defendant FARAHI and Amouei then well knew, all of the investors of NPFS had not received a package containing a PPM; and (2) Amouei mailed PPMs to investors who renewed their investments with NPFS, when in truth and in fact, as defendant FARAHI and Amouei then well knew, she had not.

43

COUNT FORTY-ONE

[18 U.S.C. § 1512(b)(1)]

57.   The Grand Jury hereby repeats and realleges paragraphs 1-7, 19-28, 30-31, and 50 of this Indictment as if fully set forth herein.

58.   In or about July 2009 or in or about August 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendant JOHN FARAHI, assisted by others known and unknown to the Grand Jury, knowingly used intimidation, threatened, corruptly persuaded, and engaged in misleading conduct towards another person, and attempted to knowingly use intimidation,

//
//
//
//

44

threaten, and corruptly persuade another person, namely, ET, with
intent to influence, delay, or prevent that person's testimony in
an official proceeding, namely, the S.E.C. Formal Investigation
and the S.E.C. Action.

A TRUE BILL

/S/
Foreperson

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

BEONG-SOO KIM
Assistant United States Attorney
Chief, Major Frauds Section

JILL FEENEY
Assistant United States Attorney
Deputy Chief, Major Frauds Section

AARON M. MAY
PAUL G. STERN
Assistant United States Attorneys
Major Frauds Section

45